CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

MAY 02 2013

JULIA C. DUDLEY, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:13CR00005 |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| JERRY RICHARD BLACKWELL, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | By: B. WAUGH CRIGLER |
| | ) | U.S. MAGISTRATE JUDGE |

In accordance with the provisions of Title 28 U.S.C. § 636(b)(3), and upon the defendant's consent, this case was referred to the undersigned to conduct a plea hearing.

**DEFENDANT'S RESPONSES TO RULE 11 INQUIRY**

On February 27, 2013, the Grand Jury charged the defendant with several counts in a multi-count Indictment. (Dkt. 1.) In Count One, the defendant was charged with that on or about and between January 14, 2008 and August 3, 2012, in the Western Judicial District of Virginia and elsewhere, the defendant, Jerry Richard Blackwell, did knowingly and intentionally combine, conspire, and agree with other persons, both known and unknown to the Grand Jury, to manufacture, to possess with intent to distribute, and to distribute over fifty (50) grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and all in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A). (Dkt. No. 1.) In Count Two, that on or about and between April 8, 2011 and August 3, 2012, in the Western Judicial District of Virginia, the defendant, Jerry Richard Blackwell, knowingly and intentionally possessed pseudoephedrine, a listed chemical as defined in Title 21, United States Code, Section 802, with intent to manufacture methamphetamine, a Schedule II controlled substance, in a manner other than authorized by Title 21, United States Code, Sections 801 through 904, all in violation of Title 21, United States

Code, Section 841(c)(1). *Id.* at 1-2. Finally, in Count Three, that on or about and between April 8, 2011 and August 3, 2012, in the Western Judicial District of Virginia, the defendant, Jerry Richard Blackwell, while manufacturing and attempting to manufacture methamphetamine, a Schedule II controlled substance, created a substantial risk of harm to human life, all in violation of Title 21, United States Code, Section 858. *Id.* at 2. On April 23, 2013, the defendant appeared before the undersigned to enter his plea to a lesser charge that relates to his conduct in the criminal enterprise.[1] Specifically, he appeared to plead guilty to one of the objectives of the conspiracy alleged in Count 1 of the Indictment; namely, conspiring to manufacture more than five (5) grams of methamphetamine, a controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B).

The defendant was placed under oath and testified that his full legal name is Jerry Richard Blackwell, he was born on March 11, 1970, and he had completed two and a half (2.5) years of college and taken several extended education courses. The defendant stated that he can read, write, and understand the English language. The defendant further stated that he was fully aware of the nature of the charges against him, the maximum punishment he faces, and the consequences of pleading guilty to the charges. He informed the court that he suffered no physical or mental condition and was not under the influence of any substance that would impair his ability to understand what the court was saying or the nature of the proceedings. He testified that he had received a copy of the Indictment, and that he had fully discussed with his counsel the charges set forth therein, the maximum punishment for the charges, any defenses thereto, and his case in general. The defendant stated he was before the undersigned to enter into a plea agreement and plead guilty to one of the objectives of the conspiracy alleged in Count One of the Indictment ("lesser charge"). The defendant testified that he understood that the offense set forth

---

[1] The defendant further acknowledged that he had the right to proceed before a District Judge, and he expressly consented to proceed before the undersigned. (Dkt. No. 16.)

in the lesser charge under Count One is a felony, and if his plea is accepted, he will be adjudged guilty of that offense.

The defendant acknowledged that the maximum statutory penalty under the lesser charge in Count One is a $5,000,000 fine and/or imprisonment for a term of forty (40) years, plus a term of supervised release. He also acknowledged that there is a mandatory minimum sentence of imprisonment for a term of five (5) years. The defendant was informed that parole has been abolished, and that if he is sentenced to incarceration, he will not be released on parole, but on supervised release, a violation of which could result in additional incarceration. The government was not seeking forfeiture. However, the defendant acknowledged that he may be required to pay restitution and, if so, must make a good faith effort to do so and comply with all the terms set forth in the Plea Agreement discharging his financial responsibility. The defendant also acknowledged that, upon conviction, he will be required to pay a mandatory special assessment of $100 per felony count. He agreed that the stipulated facts filed with the court accurately set forth all factual elements sufficient to sustain his plea of guilty. Finally, he understood that the Government would move, at sentencing, to dismiss him as a defendant in all remaining counts of the Indictment, provided that he complied with all his obligations under the Plea Agreement. He stipulated and agreed that the Government had probable cause to bring all the counts in the Indictment which would be dismissed under the Plea Agreement, and that these charges were not frivolous and that he was not a "prevailing party" with regard to these charges.

The defendant was informed that, under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow in determining a reasonable sentence in a criminal case. He was then informed that the Sentencing Guidelines are no longer mandatory, but that the sentencing judge may apply them in an advisory fashion in determining a reasonable sentence. The defendant testified that he and his counsel had discussed how the Sentencing Guidelines might apply in his case. He also testified that he understood that

the court would not be able to determine the applicable guideline range, for advisory purposes, until after a presentence report has been prepared and both parties have been given an opportunity to review and, if applicable, to object to the reported facts and application of the Guidelines. The defendant stated that he understood that the eventual sentence imposed may be different from any estimate his attorney had given him, or any recommendation by the government, and that the court has the authority to impose a sentence that is either higher or lower than that called for by the Guidelines, so long as the sentence is not greater than the statutory maximum for the offense to which the defendant is pleading guilty. He also acknowledged that, should that occur, he would not be entitled to withdraw his plea of guilty. At this time, the parties submitted a signed copy of the Plea Agreement. The defendant acknowledged that his signature appeared at the end of the Plea Agreement and his initials on each page.

The defendant acknowledged that the parties agreed that the 2012 version of the United States Sentencing Guidelines Manual is applicable. The defendant stipulated that § 2D1.1(c) of the Guidelines is applicable to his conduct, assigning a base offense level of thirty (30), and that both he and the United States would be free to argue whether other Guidelines sections should or should not apply; to the extent the arguments are not inconsistent with the stipulations, recommendations, and terms set forth in the Plea Agreement. The defendant acknowledged that the United States agreed to recommend a sentence at the low end of the applicable guideline range. The defendant stated that he understood that, contingent upon his acceptance of responsibility, continued cooperation in the sentencing process, and fulfillment of his duties under the Plea Agreement, the government will recommend a two-level (2) reduction under USSG § 3E1.1(a), and, if applicable, the government will move that he be given an additional one-level (1) reduction under USSG § 3E1.1(b). The defendant also stated that he understood that, even if he fully cooperates with law enforcement, the government is under no obligation to

4

file a motion to reduce his sentence for substantial assistance, and if the government makes the motion, it is up to the court to determine how much of a departure, if any, should be imposed. The defendant agreed that he had knowingly and voluntarily waived his rights to request or receive any records pertaining to the investigation or prosecution of his case, including any records that may be sought under the Freedom of Information Act or the Privacy Act of 1974. The defendant acknowledged his monetary obligations under the Plea Agreement and that the amounts determined were due immediately and subject to immediate enforcement. He understood that he would make good faith efforts toward payment of all mandatory assessments, restitution, and fines, with whatever means he has at his disposal. He agreed to grant the United States a wage assignment, liquidate assets, or complete any other tasks which will result in immediate payment in full, or payment in the shortest time in which full payment can be reasonably made. He understood that he would provide a complete and truthful financial statement if called upon to do so and agreed that he would not convey anything of value to any person without the authorization of the U.S. Attorney's Office from the time of the signing of this agreement or the date he signs his financial statement, whichever is earlier. Finally, the defendant abandoned his interest in any items seized by any law enforcement agency during the course of the investigation.

The defendant acknowledged that he was waiving (giving up) his right to have a jury determine beyond a reasonable doubt the facts alleged in the Indictment, including any facts that could impact sentencing. The defendant testified that he understood that he had the right to a trial by a jury, in addition to the following rights, which will be waived or given up upon pleading guilty:

1. The right to plead not guilty to any offense charged against him;
2. The right at trial to be presumed innocent and to force the government to prove his guilt beyond a reasonable doubt;
3. The right of assistance of counsel at trial and in any subsequent appeal;

4. The right to see, hear, and cross-examine witnesses;
5. The right to call witnesses to testify on his own behalf and to the issuance of subpoenas or compulsory process to compel the attendance of witnesses;
6. The right to decline to testify unless he voluntarily elects to do so in his own defense;
7. The right to a unanimous guilty verdict; and
8. The right to appeal a guilty verdict.

The defendant testified that he understood that, under the terms of the agreement, he was waiving his rights to appeal, except that he was not waiving his right to appeal or have his attorney file a notice of appeal as to any issue which cannot by law be waived. The defendant acknowledged that he had agreed to waive his right to collaterally attack his conviction or sentence in the case, except to the extent such attack is based on ineffective assistance of counsel or a constitutional defect in the jurisdiction of the court. The defendant was informed that, if he chose to appeal, the government could treat such as a breach of the Plea Agreement and exercise all of its remedial rights under the Plea Agreement, including the right to recharge him. The defendant also understood that his counsel was obliged to file a notice of appeal if the defendant requested it, even if it would hurt the defendant's interests.

The defendant testified that he understood that, if found guilty, he would be deprived of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess a firearm. The defendant acknowledged that the Plea Agreement only binds the U.S. Attorney's Office for the Western District of Virginia. Furthermore, he stated that no one had threatened, intimidated, or forced him to enter the Plea Agreement or plead guilty, and he was pleading guilty of his own free will because he was, in fact, guilty.[2] The

---

[2] The defendant originally stated that the evidence was not as valid as it appeared, several witnesses were lying, and that he was pleading guilty because he felt like he had no choice. The undersigned ordered a recess to allow the defendant to confer with his counsel. After this recess, the defendant clarified that while he disagreed with some of the witness testimony, he agreed with the Government's evidence regarding the necessary elements of the offense to which he was

defendant also stated that he was satisfied with the advice and representation given to him in this case by his counsel and that he believed the representation had been effective. The defendant asked the court to accept his plea of guilty to the lesser charge in Count One. (Dkt. Nos. 17, 19.)

**THE GOVERNMENT'S EVIDENCE**

The defendant and the Government agreed to a Stipulation of Facts. (Dkt. No. 18.) The Stipulation of Facts having been filed in open court, the evidence presented therein regarding the offenses charged is as follows:

### INTRODUCTION

COME NOW the United States of America; the defendant, Jerry Richard Blackwell ("Blackwell"); and his defense counsel, J. Lloyd Snook, III, and stipulate to the Court that the United States would have presented the following evidence had this case gone to trial:

### HISTORICAL TESTIMONY

A confidential informant ("CI-1") stated that Blackwell lived in a house near the traffic circle in Gordonsville, Virginia; Blackwell shared the house with a roommate William Martin Schwind ("Schwind"). At this house, CI-1 witnessed Blackwell cook methamphetamine from boxes of pseudoephedrine on multiple occasions between the dates listed in the indictment. CI-1 saw Schwind present at many of these cooks.

A second confidential informant ("CI-2") witnessed Blackwell cook methamphetamine at the house in Gordonsville. In addition, CI-2 stated that he/she purchased methamphetamine more than 25 times in half gram to gram quantities from Blackwell. CI-2 also stated that Schwind bought pseudoephedrine and supplies necessary for Blackwell to cook methamphetamine.

---

pleading guilty. Furthermore, both the defendant and his counsel affirmed that the defendant was pleading guilty voluntarily and without any coercion.

A third confidential informant ("CI-3") stated that between the dates listed in the information,[3] Blackwell cooked methamphetamine inside the home in Gordonsville. CI-3 also stated that Schwind bought supplies and pseudoephedrine necessary for Blackwell to cook methamphetamine.

A fourth confidential informant ("CI-4") also witnessed Blackwell cook methamphetamine inside the Gordonsville residence. Beginning in 2011 and through the summer of 2012, CI-4 witnessed Blackwell cook methamphetamine approximately 15 or 20 times at the home. During some of the cooks, CI-4 witnessed Blackwell and Schwind cooking methamphetamine together. According to CI-4, Blackwell gave Schwind methamphetamine yielded from cooks in exchange for Schwind providing pseudoephedrine, other methamphetamine manufacturing ingredients, and a place to cook the methamphetamine. CI-4 described Blackwell's method in cooking methamphetamine including the chemicals and processes Blackwell used. According to CI-4, Blackwell used pseudoephedrine and red phosphorous in his cooks. Blackwell rendered pseudoephedrine from cold pills purchased from pharmacies near his residence; Blackwell's red phosphorous came from striker plates found on boxes of matches. Other ingredients that CI-4 stated Blackwell used in his methamphetamine cooks included HEET antifreeze, Coleman fuel, acetone, rubbing alcohol, and muriatic acid. CI-4 also stated that Blackwell used between 1 and 2 boxes or 2.4 and 4.8 grams of pseudoephedrine per batch in manufacturing methamphetamine. Blackwell would have to separate the pseudoephedrine from the other ingredients in the cold pills, and then, he would cook that pseudoephedrine into methamphetamine. When Blackwell cooked methamphetamine, each gram of pseudoephedrine used in a cook yielded approximately .75 grams of actual

---

[3] The undersigned believes that the Government actually is referring to the February 27, 2013 Indictment. (Dkt. No. 1.)

8

methamphetamine. This yield described by CI-4 was consistent with estimates calculated by a DEA expert in the field of methamphetamine manufacturing. In addition, the process of separating pseudoephedrine from the other ingredients in the cold pills also caused some loss in pseudoephedrine. The amount of pseudoephedrine loss at this stage varied.

A fifth confidential informant ("CI-5") witnessed Blackwell cook methamphetamine in Schwind's kitchen. On some occasions, CI-5 saw Schwind help Blackwell with the cooking process. CI-5 also stated that Schwind supplied Blackwell with pseudoephedrine to use in his cooks. Like CI-4, CI-5 described Blackwell's method in cooking methamphetamine by identifying the same chemicals and processes that CI-4 identified. According to CI-5, Blackwell used approximately three boxes of pseudoephedrine (7.2 grams) in each cook. CI-5 estimated that Blackwell yielded anywhere from 3 to 5 grams of actual methamphetamine per batch. CI-5 also stated that Blackwell gave Schwind a portion of the methamphetamine cooked in exchange for Schwind providing pseudoephedrine, methamphetamine manufacturing materials, and a place to cook methamphetamine.

A sixth confidential informant ("CI-6") supplied Blackwell with pseudoephedrine for use in cooking methamphetamine. According to CI-6, CI-6 gave Blackwell a quantity of pseudoephedrine, usually two boxes (4.8 grams of pseudoephedrine), and Blackwell used the boxes to cook methamphetamine. In exchange for the pseudoephedrine, Blackwell gave CI-6 a quantity of the methamphetamine produced after the cook.

**CONSENT SEARCH OF THE GORDONSVILLE RESIDENCE**

With Schwind's consent, DEA and Blue Ridge Narcotics and Gang Task Force searched the Gordonsville residence Schwind and Blackwell shared, where multiple confidential

informants stated that Blackwell cooked methamphetamine. Inside Schwind's home, law enforcement officers found Coleman fuel, rubbing alcohol, boxes of matches (with striker plates containing red phosphorous), a mortar and pestle, muriatic acid, HEET antifreeze, and acetone—all commonly used materials in methamphetamine manufacturing.

### PSEUDOEPHEDRINE PURCHASE LOGS

DEA and the Blue Ridge Narcotics and Gang Task Force collected pseudoephedrine purchase logs in the area around the Gordonsville residence. Because of its use in methamphetamine manufacturing, pseudoephedrine purchases are logged and tracked by pharmacies. When a person buys a quantity of pseudoephedrine, the pharmacy will note the amount of pseudoephedrine purchased, document the purchaser's ID or driver's license, and record the purchaser's signature. The pseudoephedrine purchase logs from the pharmacies around the Gordonsville residence showed that Blackwell purchased 123 grams of pseudoephedrine between the dates listed in the indictment. The calculations of 123 grams of pseudoephedrine equal approximately between 35 and 50 grams of actual methamphetamine given Blackwell's cooking technique and results witnessed by cooperators.

### INTERVIEWS WITH LAW ENFORCEMENT

During interviews with law enforcement, Blackwell stated that he used methamphetamine because he was addicted to it.

## FINDINGS OF FACT

Based on the evidence presented at the plea hearing, the undersigned now submits the following formal findings of fact, conclusions and recommendations:

(1) The defendant is fully competent and capable of entering into a plea agreement and entering an informed plea;

(2) The defendant is aware of the nature of the charges and the consequences of his plea;

(3) The defendant knowingly and voluntarily entered into the Plea Agreement as well as a plea of guilty to the lesser charge in Count One of the Indictment; and

(4) The evidence presents an independent basis in fact containing each of the essential elements of the offenses to which the defendant is pleading guilty.

Thereupon, the defendant was arraigned on the lesser charge in Count One of the Indictment and pled guilty thereto.

## RECOMMENDED DISPOSITION

Based upon the above findings of fact, the undersigned FINDS that defendant has knowingly, voluntarily and freely entered his plea of guilty to the lesser charge in Count One of the Indictment as well as executed the Plea Agreement in this case. The undersigned RECOMMENDS that the court accept the defendant's plea of guilty to the lesser charge in Count One of the Indictment and DIRECTS that a presentence report be prepared. A sentencing hearing hereby is scheduled for July 19, 2013 at 1:30 p.m. before the presiding District Judge in Charlottesville.

## NOTICE TO PARTIES

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C): Within fourteen days (14) after being served with a copy of this Report and Recommendation, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. The presiding District Judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The presiding District Judge may accept, reject, or modify, in whole or in

part, the findings or recommendations made by the undersigned. The judge may also receive further evidence or recommit the matter to the undersigned with instructions.

Failure to file timely written objections to these proposed findings and recommendations within fourteen days could waive appellate review. At the conclusion of the fourteen-day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk is hereby directed to send a certified copy hereof to all counsel of record.

ENTERED: _____
United States Magistrate Judge

Date: May 2, 2013